UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Imaginative Research Associates, Inc.,<br>    *Plaintiff*, | Civil No. 3:07cv861 (JBA) |
|     *v.* | |
| Jose E. Ramirez and Jose Ramirez, PhD, LLC,<br>    *Defendants*. | June 8, 2010 |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Imaginative Research Associates, Inc. ("IRA") brings this suit against Jose E. Ramirez ("Ramirez"), its former founder and partner, and Jose Ramirez, Ph.D., LLC (the "PhD LLC") (collectively, "Defendants"), a company Ramirez founded after leaving IRA. IRA claims that after Ramirez left IRA, the Defendants disclosed and used IRA's confidential information in violation of certain contractual, common–law, and statutory duties. Defendants assert counterclaims based on the same and other contracts as well as common–law principles and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.* Following discovery, Defendants moved for summary judgment on Plaintiff's claims and their counterclaims, which Plaintiff opposes. For the reasons that follow, Defendants' motion for summary judgment will be granted in part and denied in part.

I.    Facts

Taken in the light most favorable to the non-moving Plaintiff, the record reveals that the parties' dispute arises out of the following factual scenario.[1]

---

[1] Under the familiar summary–judgment standard, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

1.

After earning his Ph.D. in physical chemistry in 1970, Ramirez began working in the cosmetics and pharmaceuticals industry.  Between 1970 and 1987 Ramirez worked at various companies at which he was responsible for developing and introducing new products, including creams, lotions, antibiotics, vitamins, aerosol sprays, wipes, sticks, cleansers, emulsions, and solutions.  In 1987 he and Mohan Vishnupad ("MV") formed IRA, and between 1987 and 2000 they worked together and invented products and obtained a number of patents "having substantial financial value." (2d Ramirez Aff. at ¶ 13.[2])  According to MV's daughter Naomi Vishnupad ("NV"), who joined IRA in October 2001 and is now its president, "IRA is a chemical research and development company focused on skin care products, cosmetics and prescription dermatology products," and works primarily to develop products based on benzoyl peroxide ("BPO") "to treat acne." (NV Dep. at 26; NV Aff. at ¶¶ 2, 3.)  IRA is "well known within industry circles as a highly innovative formulator of BPO compositions."  (*Id.* at ¶ 4.)  BPO is a well-known acne-fighting compound.  (MV Dep. at 136 ("[A]ny professional who is in this business knows that [BPO] is the most effective treatment for acne.").)

Although "[t]he overwhelming majority of IRA's research and development work and know how is not patented" and is instead "treated as confidential by IRA and its licensees" (NV Aff. at ¶ 6), IRA has applied for and obtained a number of patents.  One of these patents is U.S. Patent No.

---

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Conversely, "[s]ummary judgment is inappropriate when the admissible materials produced in opposition to the summary judgment motion 'make it arguable' that the claim has merit."  *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)).

[2] Ramirez has submitted two affidavits, the first dated February 8, 2008 (Defs.' Ex. 3) and the second dated September 14, 2009 (Defs.' Ex. 1).

5,632,996 (the "'996 Patent"), which issued on May 27, 1997, which Ramirez and MV assigned to IRA, and whose abstract claims: "[n]on-irritating compositions containing benzoyl peroxide and a non-irritating benzoic acid ester are useful in preparing products suitable for use in contact with the skin." (NV Ex. F & Defs.' Ex. 17-2.[3])   IRA licensed its patent to two companies that make competing acne-treatment products: Medicis, which manufactures "TRIAZ," and Johnson & Johnson, which manufactures "Clean & Clear."   In 2000, IRA contracted with one of its existing customers to develop new products based on existing and new BPO compounds.   According to MV and NV, Ramirez was heavily involved in the development of these products until his departure in August. (*See* NV Dep. at 69–72; MV Dep. at 169–72.)[4]

2.

For reasons that do not appear in the record, MV and Ramirez decided to go their separate ways, and "[i]n August 2000 [they] entered into several agreements for the purpose of dividing [their] interest in IRA and winding up [their] business relationship." (2d Ramirez Aff. at ¶ 15.) Ramirez then formed the PhD LLC.  The documents they signed that month form the basis of this case.

---

[3] Exhibits to the Affidavit of Naomi Vishnupad [Doc. # 159-2], which are numbered, are cited as "NV Ex. [#]."  Exhibits to the Declaration of Brian E. Moran [Doc. # 159-18], which are lettered, are cited as "Moran Ex. [letter]."  Exhibits to the Declaration of Christopher J. Major [Doc. # 159-24], which are lettered, are cited as "Major Ex. [letter]."  Defendants' exhibits, which are attached to their Memorandum in Support of Summary Judgment [Doc. # 149-2] and which are numbered, are cited as "Defs.' Ex. [#]."

[4] Plaintiff and Defendants each moved to file certain documents under seal (*see* Defs.' Mot. to Seal [Doc. # 150]; Pl.'s Mot. to Seal [Doc. # 155]), which the Court granted orally on February 5, 2010 (*see* Minute Entry for Feb. 5, 2010 [Doc. # 171]).  The Court's ruling on the motion for summary judgment does not require discussion of the facts that appear in the sealed portion of the record.

First, on August 18, 2000, Ramirez and MV reached an agreement on a "Proposal" initially made by Ramirez to MV, which agreement formed the basis of the contracts they executed on August 23, 2000. The Proposal lists eight "Purpose[s]" and 17 "Steps" to accomplish them. The Proposal's purposes included:

    a.      Terminate 50/50 ownership

    b.      Orderly termination of employee as of 12/31/00

    c.      Orderly transfer of pension funds . . .

    h.      To close on 8/23/00.

(Fax & Proposal, Defs.' Ex. 4, at 2.) The Proposal's steps included:

    1.      JR sells 1% of company to MV on 8/23/00 for $5,000.

    2.      JR agrees to sell 49% of company stock on 8/23/00, effective date 12/31/03 for a price of $245,000[.]

    3.      Stock price of $245,000 to be paid as mutually agreed (either installments [of "$2150 mo. starting 1/1/04"] or other appropriate method.

    4.      JR will remain a stock holder of company until 12/31/03.

    5.      Company will sign an irrevocable consulting agreement effective 1/1/01 with [the PhD LLC] for 12.5 years at a rate of [$]220,000 for 12.5 yrs – [$]18333/mo.

(*Id.* at 2–3.) The Proposal concluded with Ramirez's observation that

> It is my understanding that the steps and procedures outlined above will help us agree on the terms for a successful closing. If there are serious disagreements or concrete financial (e.g. pension data) information is missing, I suggest we delay next week's closing date.

(*Id.* at 3.) The Proposal bears the signatures of both Ramirez and MV. (*Id.*) Five days later, on August 23, 2000, Ramirez and NV signed a number of contracts (collectively, the "August 2000 Arrangement"), which included six separate contracts: an "Agreement" (the "First Agreement" (Defs.' Ex. 5)); a Confidential Disclosure Agreement (Defs.' Ex. 7 & NV Ex. C); a Consulting Agreement (Defs.' Ex. 8 & NV Ex. D); a Stock Redemption Agreement (Defs.' Ex. 9 & NV Ex. A);

an Addendum Agreement (Defs.' Ex. 11 & NV Ex. E); and a Second Addendum Agreement (Defs.'

Ex. 13).[5]  Additionally, on January 1, 2001, IRA and Ramirez executed an Employment Agreement

(Defs.' Ex. 6 & NV Ex. B), and on December 31, 2003 MV executed a Promissory Note (Defs.' Ex.

10).

    *The First Agreement.*  The First Agreement, which states that it is "by and among" Ramirez,

NV, IRA, and an IRA subsidiary called RAVI, provided that

> WHEREAS, IRA has a total of 5000 shares of common stock authorized, all of which is issued fully paid, non-assessable and outstanding (the "Stock"); and,
>
> WHEREAS, Ramirez owns 2,500 shares of the Stock and desires to have his stock interest in IRA redeemed by IRA; and,
>
> WHEREAS, IRA desires to redeem the shares of Stock owned by Ramirez, which will result in MV then owning one hundred percent (100%) of the Stock of IRA and,
>
> WHEREAS, Ramirez and IRA desire that said redemption shall occur in two transactions, the first occurring on the date hereof, whereupon IRA shall redeem 50 shares of the Stock from Ramirez and the second occurring on December 31, 2003, whereupon the remaining 2,450 shares of Stock shall be redeemed from Ramirez by IRA; and,
>
> WHEREAS, Ramirez desires to transfer his entire interest in RAVI to MV, which will result in MV then owning the entire Membership Interest in RAVI, subject to the terms and conditions set forth herein
>
> NOW THEREFORE, in consideration of the premises and the mutual covenants contained herein, Ramirez, [IRA], RAVI and MV hereby agree as follows:

---

[5] Also on August 23, 2000, MV signed an irrevocable trust indenture, pursuant to which he set up a trust "to act as a repository for funds which may be needed to honor certain financial obligations of [MV] or entities under his immediate control."  The indenture provided that while MV is alive, and "for so long as there exists any indebtedness owed by [IRA] to [Ramirez] or [the PhD LLC], the Trustee may, from time to time, pay to or for the benefit of [the PhD LLC], so much of the net income and/or principal of the trust, in such proportions and amounts as the Trustee shall determine, in its absolute and uncontrolled discretion."  The indenture further provided that after IRA's indebtedness to Ramirez or the PhD LLC was "extinguished," trust funds could be paid only "for the benefit of [MV's] wife and/or children."  (MV Trust Indenture Irrevocable, Defs.' Ex. 12, at 3–4 (art. 1, § A).)

(First Agreement at 1.)  The First Agreement provided that Ramirez would transfer his IRA stock to an escrow agent, Lawrence P. Lemieux, CPA, at a particular redemption price to be paid by IRA:

> The redemption price for the stock to be redeemed hereunder (the "Redemption Price") is:
>
> for the FIFTY (50) shares of stock to be redeemed on the Closing Date – FIVE THOUSAND ($5,000.00) dollars;
>
> for the TWO THOUSAND FOUR HUNDRED FIFTY (2,450) shares of stock to be redeemed on December 31, 2003 – ONE HUNDRED SEVENTY FIVE THOUSAND NINE HUNDRED SEVENTY NINE & 30/100 ($175,979.30) DOLLARS.

(*Id.* at 2 (§ 1.1.2).)  IRA was to pay the $5,000 in cash, and to pay the $175,979.30 at "SEVEN & ½ (7.5%) percent per annum, payable in ONE HUNDRED FOURTEEN (114) successive equal monthly installments of TWO THOUSAND ONE HUNDRED FIFTY ($2,150.00) dollars each" beginning on January 1, 2004 under a schedule attached to the First Agreement as a Promissory Note (*id.* (§ 1.1.3)) that set forth that IRA's 114 monthly payments were due on the first day of each month; the last payment is due "June 1, 2013, at which time the entire principal and accrued but unpaid interest thereon shall be due and payable"; that a late charge of five percent will be charged on each payment not paid within 10 days of its due date; and that upon default Ramirez had the option to call "immediately . . . due and payable" "the entire principal balance."  (First Agreement at 50–51 (Ex. B (Promissory Note) (not executed)); executed version at Defs.' Ex. 10 (with spreadsheet of schedule noting payment of interest and principal over 114 payments totaling $245,100.00).)

The parties to the First Agreement further agreed that "MV [would] purchase all of the Membership Interest owned by Ramirez in RAVI" for $1,000, payable in cash on August 23, 2000. (*Id.* at 3 (§ 1.2).)  The First Agreement also stated that neither IRA nor RAVI had any "obligation,

contingent or otherwise, under any employment agreement" or any "deferred compensation agreement, retainer or consulting arrangements, bonus or profit-sharing plan, stock option or purchase plan or other employee contract . . . or other employee or fringe benefit plan, including vacation, sick leave or disability plans or programs." (*Id.* at 6 (§ 3.10 (IRA)) and 17 (§ 3.40 (RAVI)).) The First Agreement specified that IRA had certain "intangible" property, including the ´996 Patent, and that "[IRA] has taken adequate steps to keep its proprietary information confidential and limited to its employees and agents." (*Id.* at 8 (§ 3.15) and 58 (Ex. 3.15).)

 *The Confidential Disclosure Agreement.*  IRA executed the Confidential Disclosure Agreement with Ramirez "together with its affiliates"—listed on the signature page as being the PhD LLC—because IRA "has discussed and wants to discuss patented and patent pending technologies (listed on Appendix A) owned by IRA with [Ramirez & the PhD LLC]."  Appendix A lists certain patents and pending patent applications, including the ´996 Patent.  The agreement protects certain information denominated "SAID INFORMATION" and defined as "business and/or technical information which the disclosing party regards as proprietary."  The agreement requires IRA and Ramirez & the PhD LLC to disclose "SAID INFORMATION" to one another, subject to certain conditions, including

1. that SAID INFORMATION will be received and held in confidence by the recipient. . . . [and]

3. that the recipient will not disclose or commercially utilize SAID INFORMATION without first having obtained the written consent of the disclosing party to such disclosure or utilization[.]

(Confidential Disclosure Agreement at 1.)  This agreement further specified that no non-disclosure obligations would

7

extend to any portion of SAID INFORMATION[]

    (a)    which is known to the recipient prior to receipt from the disclosing party under this [Confidential Disclosure] Agreement or is information generally available to the public; or . . .

    (e)    which is discovered or developed by the recipient independently of any disclosure from the disclosing party prior to such disclosure[.]

(*Id.* at 2.)   Finally, the agreement specified that "such commitments shall promptly and automatically terminate in their entirety upon the lapse of a period of five (5) years" (*id.*), which corresponds to August 22, 2005.

    *The Consulting Agreement.*   The Consulting Agreement, executed by IRA and the PhD LLC, states that the promises it contains are made "in consideration of" Ramirez's having "been a major stockholder, and a director and officer of IRA," IRA's redemption on the same date of "a portion of the issued and outstanding shares of capital stock owned by [Ramirez], IRA's "desire[] to have the assistance of [the PhD LLC] in the transition of management of its business in the market formerly served by [IRA]," and "the mutual promises made in th[e Consulting A]greement." (Consulting Agreement at 1 ("Recitals").)   The Consulting Agreement provides that the PhD LLC would serve as IRA's consultant "from time to time," that its "term . . . shall commence on January 1, 2001 and shall terminate on June 30, 2013," and that IRA had the authority to terminate the term early "for 'cause,'" that is, for "material breach of any written agreement with [IRA]." (*Id.* at 1–3 (§§ 1, 2, 5).)   The agreement provided that IRA would pay the PhD LLC $18,333.00 "monthly during the term of this [Consulting] Agreement" in the form two payments of $9,166.50 "each on the first and fifteenth day of each month." (*Id.* at 2 (§ 3).)   Finally, the Consulting Agreement addressed confidentiality:

    6.    <u>Confidentiality; Non-Competition; Ownership</u>
The [PhD LLC] has signed a separate agreement containing restrictions upon its disclosure or use of confidential or proprietary information in his possession as a

result of its affiliation with IRA.  The [PhD LLC] will also be provided access to confidential and proprietary information about the other operations of [IRA] as a necessary part of performing services under this [Consulting] Agreement. The [PhD LLC] agrees that it will not at any time disclose to any person, or use, in competition with or in a manner otherwise detrimental to the interests of [IRA], for the benefit of itself or others, any confidential information related to [IRA], including but not limited to know-how, formulas, trade secrets or operational methods for any reason or purpose whatsoever.

(*Id.* at 3 (§ 6) (emphases added).)

*The Stock Redemption Agreement.*  In the Stock Redemption Agreement, IRA and Ramirez repeated the terms of IRA's redemption of Ramirez's 2,500 shares in IRA—that is, Ramirez would give to IRA 50 shares in exchange for an immediate cash payment of $5,000, and that Ramirez would place the remaining 2,450 shares in escrow, and IRA would "commence payment to [Ramirez]" of $175,979.30 "in complete redemption of all of [Ramirez's] remaining interest in [IRA]," with the payments being made "[o]n the date and under the terms specified in [the] ESCROW AGREEMENT."  (Stock Redemption Agreement at 1–2.)

*Escrow Agreement.*  The Escrow Agreement, Exhibit A to the First Agreement, was made "by and among" Ramirez, MV, RAVI, IRA, and Lemieux.  This agreement appointed Lemieux as the escrow agent and "provide[d] for the payment and delivery by [Ramirez], on behalf of [IRA], of TWO THOUSAND FOUR HUNDRED FIFTY (2,450) of [Ramirez's] shares of the common stock of IRA and the concurrent delivery by [IRA] of its note payable to the order of [Ramirez] in payment for the referenced shares."  (Escrow Agreement at 41.)  Ramirez agreed to deposit his 2,450 shares of IRA with Lemieux "[s]imultaneously with the execution and delivery of" the Escrow Agreement (*id.* at 42), and the Escrow Agreement then sets forth the escrow agent's rights and obligations (*id.* at 42–48).

*The Addendum Agreement.*  In the Addendum Agreement, Ramirez, MV, RAVI, and IRA agreed that IRA would pay Ramirez his then-current salary through December 31, 2000, that "[a]ny Pension Plan contributions for the benefit of Ramirez shall be funded/paid by Ramirez," that "Ramirez will remain as a participant in the IRA Pension Plan, for vesting purposes, through December 31, 2003," and that "[e]ffective December 31, 2000, the funds in the IRA Pension Plan will be segregated by the fund manager so as to 'isolate' Ramirez'[s] portion of the Plan assets into a separate investment account."  (Addendum Agreement at 1–2 (§§ 1–4).)  The Addendum Agreement also provided that an "outstanding loan from IRA to Ramirez, having an approximate balance of $100,000.00, will be repaid to IRA on a monthly basis, prorated to December 31, 2003, e.g., approximately $33,500 per annum," and that these officer loan repayments would offset the payments IRA would make to Ramirez—that is, that "the required monthly payment needed to retire the [officer] loan will be divided by two and such resultant amount will be deducted from the consultant's fee ($18,333 per month; $9,166.50 twice per month) as actually due to be paid (i.e. – bi-monthly payments of the consultant's fee of $9166.50 minus ½ of the required monthly payments required to retire the loan balance will be the amount actually payable to [the PhD LLC] for its consultancy – the remainder will be charged against the loan balance until it is retired)."  (*Id.* at 2–3 (§§ 8, 9).)  It further specified that the PhD LLC, which on August 1, 2000 took control over a subsidiary (Vito–Mannon Polysaccharide LLC) created by IRA, would pay IRA $25,000 to reimburse IRA for IRA's expenditures in support of that subsidiary.  (*Id.* at 3 (§ 10).)

*The Second Addendum Agreement.*  Finally, the Second Addendum Agreement, "by and among" Ramirez, MV, RAVI, IRA, and the PhD LLC, stated that "[t]he first sixteen (16) payments . . . specified in . . . the Consulting Agreement . . . shall, instead, be paid directly by [IRA] to the

account of Ramirez in the IRA Pension Plan," and amended the Addendum Agreement "to reflect" this arrangement.  (Second Addendum Agreement at 1–2.)

*The Employment Agreement.*  Four months later, IRA and Ramirez executed the Employment Agreement, which provided that during an "Employment Term" of three years—Jan. 1, 2001 through Dec. 31, 2003—IRA would employ Ramirez for up to "four hours in any two consecutive calendar months" for such work that "shall include, but not be limited to, acting as an advisory chemist," and for which IRA would pay Ramirez at least $1,000 per year.  (Employment Agreement at 1.)  IRA and Ramirez also entered into two relevant covenants:

> (a)  <u>Confidentiality</u>.  [Ramirez] acknowledges that [Ramirez] has acquired and will acquired confidential information respecting the business of [IRA].  Accordingly, [Ramirez] agrees that [Ramirez] will not willfully disclose, in any manner, at any time (during the Employment Term or thereafter), any such confidential information to any unauthorized third party without the written consent of [IRA].  For purposes hereof, information shall (i) be considered confidential, if such information is proprietary to [IRA] and has not been made publicly available prior to its disclosure by [Ramirez], and (ii) be disclosable, if required by law or legal process.

> (b)  <u>Best Interests</u>.  During the Employment Term, [IRA] and [Ramirez] shall at all times act in the best interests of the other party[.]

It is undisputed that IRA never made the $1,000-per-year payments to Ramirez.

*Promissory Note.*  In the Promissory Note, IRA, as the Maker, promised to pay Ramirez, as the Holder, $245,100.00 ($175,979.30 at 7.5 percent interest per annum over 114 monthly payments on the first day of each month between January 1, 2004 and June 1, 2013) for the remaining 2,450 shares Ramirez would place in escrow under the Escrow Agreement.  It is undisputed that IRA did not make the payments under the Promissory Note on February 1, 2007 or March 1, 2007.

3.

"[I]t was understood" that after Ramirez separated from IRA, Ramirez "would continue to work as a chemist, to the extent [his] health allowed." (2d Ramirez Aff. at ¶ 20.)  In the form of the PhD LLC, Ramirez "established a lab in the same research park where IRA was located, initially at 148A Research Drive, later changing the mailing address to 116A Research Drive, [in] Milford, Connecticut." (*Id.* at ¶ 21.)  "Following [Ramirez]'s departure, IRA elected not to involve him further in [IRA's] research and development efforts with respect to the pending patents listed in Appendix A of the [Confidential Disclosure Agreement]," and never "utiliz[ed] [Ramirez's]'s] services under the Consulting Agreement or Employment Agreement." (Am. Compl. [Doc. # 29] at ¶¶ 18, 19; Answer [Doc. # 88] at ¶¶ 18, 19 (admitting allegations).)

Although they did not work together, the IRA and PhD LLC labs were apparently friendly, and so were MV and Ramirez.  According to Ramirez, they "were neighbors and the chemists in [their] labs had cordial relations, sometimes borrowing chemicals from each other." (*Id.* at ¶ 23; *accord* NV Dep. at 26.)  At some point in time not revealed in the record, in a "[v]ery short" telephone conversation, Ramirez asked MV for his permission to employ IRA's patent counsel, Peter DeLuca, to help Ramirez apply for a patent.  MV could not remember whether Ramirez disclosed to MV that his application would be for a patent for a BPO composition, but testified that he had no trouble permitting Ramirez to use Mr. DeLuca's services (MV Dep. at 135) because MV "had full confidence" that Ramirez's post-separation work did not use IRA's technology and that Ramirez was not "doing something to breach the agreement at that time," especially because the August 2000 Arrangement made "very clear" that Ramirez would require MV's written consent in order to do anything "related to IRA technologies" (*see id.* at 134–36).  After deciding to move IRA to Massachusetts, on June 21, 2005 MV "sold [Defendants] a hood and oven to use in [their] lab" for

$1,500 and also "offered [them] other equipment that [they] declined." (2d Ramirez Aff. at ¶ 58; Check for $1500, Defs.' Ex. 15.)

In November 2003 Ramirez had hired a research chemist named Joseph R. Faryniarz to work with him, and on March 10, 2006, with Mr. DeLuca's assistance, Ramirez and Faryniarz applied for a patent that issued on June 24, 2008 as U.S. Patent No. 7,390,431 B2 (the "´431 Patent"). The ´431 Patent's abstract states: "[o]rganic peroxide compositions are stabilized against decomposition by the use of antioxidants, resulting in increased shelf life of products made using the compositions," and it referenced the ´996 Patent issued to Ramirez and MV in 1997 as prior art. (Defs.' Ex. 17–3.) With Mr. DeLuca's assistance, Ramirez and Faryniarz applied for a second patent on November 21, 2007, which issued on November 4, 2008 as U.S. Patent No. 7,445,729 B2 (the "´729 Patent"). The ´729 Patent contained the same abstract as the ´431 Patent, and also listed the ´996 Patent as a reference. (Defs.' Ex. 17–4.)

Within months of Ramirez and Faryniarz's application for what became the ´431 Patent, NV discovered that application in a routine search of patent applications, and "noticed that not only was [Ramirez] doing benzoyl peroxide work, but he had cited the IRA patents, used the IRA technology, was claiming it to be his own, and then taking an opportunity in his own patent application to criticize our patent." (NV Dep. at 30.) NV testified that she based this conclusion on "huge sections of [Ramirez's] patent application where he claims that he processes benzoyl peroxide in a unique way," and while "[t]hat's what he claims his invention to be, . . . in fact, that is what IRA's patent technology and know-how is." (*Id.* at 30–31.) NV found that some of the processes and chemical combinations that Ramirez and Faryniarz discussed in the ´431 and ´729 Patents involved "formulas that are not published in the [´996 Patent]" but "are in [IRA's] notebooks," including a

particular formula combining BPO with other chemicals, "which no one else had done" and which she reiterated was "not published in the [´996 Patent]."  (*Id.* at 82–83.)

II.     Discussion of Plaintiff's Claims

        A.     Circumstantial Evidence of Use of Trade Secrets and Confidential Information

        The gravamen of IRA's suit is that while working at IRA—including just before August 2000, while contributing to IRA's work for Medicis—Ramirez obtained information regarding more effective BPO solutions and compounds, that Ramirez used this information in the PhD LLC's efforts leading up to the applications for the ´431 and ´729 Patents, and that Defendants used this information to develop a product for Obagi that would compete with the product IRA was developing for Medicis.  IRA claims that in using that confidential information Ramirez and the PhD LLC breached the confidentiality agreements they had made with IRA, and for which IRA had paid a substantial sum of money.  Defendants counter that IRA has proffered no direct evidence that Ramirez or Faryniarz used this information; Defendants have proffered notebooks showing Faryniarz's trial-and-error efforts, postdating August 2000, to develop the compounds at issue in the ´431 and ´729 Patents.

        In response, Plaintiff points to the very close relationship between the know-how, processes, and compounds on which Ramirez worked while at IRA, and those involved in the ´431 and ´729 Patents.  While at IRA, including in his last months there, just before turning his attention to the PhD LLC, Ramirez worked on experiments designed to produce a BPO solution rather than a mere compound, so as to increase the effectiveness of the products.  As the applications for the ´431 and ´729 Patents reveal, this is also precisely the work that Ramirez and Faryniarz were doing for the PhD LLC.  For example, according to NV, Ramirez was involved in IRA's trial-and-error efforts to develop a BPO spray, and to upscale and manufacture IRA's products with a variety of applicators,

and these matters were not published in any IRA patent application or the ´996 Patent.  (NV Dep. at 69–70.)

While the correlation in this work subject matter is not *direct* evidence of misuse of IRA's confidential information and trade secrets, it does constitute circumstantial evidence that could support a reasonable jury's conclusion that Ramirez used to his advantage processes, know-how, or other information or trade secrets he saw, learned, or developed while at IRA.  A reasonable jury could come to this conclusion especially in light of the fact that although Ramirez has a Ph.D. in physical chemistry and had worked on creams, lotions, sprays, wipes, sticks, emulsions, and solutions before forming IRA with MV, he acquired the bulk—if not all—of his experience with BPO while at IRA, and that the evidence shows the entirety of Ramirez's experience for the 13 years preceding August 23, 2000 to have been gained at IRA.  Ramirez denies having used confidential information he obtained from IRA, Faryniarz asserts that he developed the technologies at issue in the ´431 and ´729 Patents through trial and error, and Defendants proffer Faryniarz's research notebooks showing his having engaged in substantial trial and error.  However, a reasonable jury could conclude, to the contrary, that Ramirez and the PhD LLC used IRA's confidential information and trade secrets in their post-2000 research and development efforts.  *See, e.g.*, *In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) ("Circumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge." (citing *Smith v. California*, 361 U.S. 147, 154 (1959))).  This circumstantial evidence includes Ramirez's lengthy tenure at IRA and work there on BPO solutions and compounds; that virtually all of Ramirez's BPO-related experience and knowledge appears to be drawn from his work for IRA and included his learning information that IRA never disclosed publicly; the close similarity between the BPO-related work Ramirez did at IRA and the BPO-related research underpinning the applications

for the ´431 and ´729 Patents; and that Ramirez and Faryniarz worked together on their "research

and development on th[e] [BPO] products in soluble form" (2d Ramirez Aff. at ¶¶ 29, 30; Faryniarz

Aff., Defs.' Ex. 2, at ¶ 26).   Of course, it may be, as Defendants assert, that neither Ramirez nor the

PhD LLC used any of IRA's know-how, information, knowledge, or trade secrets, but on summary

judgment, it is not possible to conclude, "reviewing the record as a whole," that "'it is quite clear

[that] the truth is'" that Defendants did not do so.  *Id.* at 151–52 (reciting "[s]ummary [j]udgment

[p]rinciples").

> B.      Preemptive Effect of Connecticut Unfair Trade Secrets Act

The parties dispute whether IRA's breach-of-contract claims are preempted or superseded

by the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-50 *et. seq.*, which

provides in pertinent part:

> (a)  Unless otherwise agreed by the parties, the provisions of this chapter supersede
>      any *conflicting* tort, restitutionary, or other law of this state pertaining to civil
>      liability for misappropriation of a trade secret.
> (b)  This chapter does not affect: (1) [*c*]ontractual or other civil *liability or relief that
>      is not based upon misappropriation of a trade secret*; . . .

Conn. Gen. Stat. § 35-57 (emphases added).   The parties dispute whether a contract claim that is

"based upon misappropriation of a trade secret" "conflict[s]" with CUTSA, and is therefore

"supersede[d]" by it.  The statute is not entirely clear; no Connecticut court has addressed this issue,

and neither have those federal courts that have construed § 35-57.   Contrary to the Defendants'

reading of *On–Line Technologies, Inc. v. Perkin–Elmer Corp.*, 253 F. Supp. 2d 313, 335 (D. Conn.

2003), *vacated and remanded in part on other grounds, On–Line Technologies, Inc. v. Bodenseewerk

Perkin–Elmer GmbH*, 386 F.3d 1133 (Fed. Cir. 2004), this Court did not discuss any preemptive

effect on the contract claims.   It did hold that CUTSA preempted a fraud claim because it was "built

on the theory that the two alleged fraudulent actions resulted in or furthered misappropriation of

16

trade secrets," and thus its allegations "d[id] not go beyond" the language in § 35-57(a).  *Id.* at 334. By contrast, the Court rejected the plaintiff's breach-of-contract claim not because it was preempted by CUTSA, but because the plaintiff had "concede[d] that neither alleged contract provides any more protection than would be afforded under CUTSA," and "because no reasonable jury could find a CUTSA violation, there can be no breach of contract."  *Id.* at 335.[6]

As to IRA's contract claims, the Court does not read CUTSA as preempting them, whether or not they are based on allegations of Ramirez's having done anything more than misappropriate trade secrets.  The Connecticut legislature enacted the current § 35-57(b)(1) by adopting, without alteration, the version of section 7(b)(1) of the Uniform Trade Secrets Act ("UTSA") that the National Conference of Commissioners on Uniform State Law adopted at its 1979 Annual Conference, with the comment that:

> This Act is not a comprehensive remedy.  It applies to duties imposed by law in order to protect competitively significant secret information.  *It does not apply to duties voluntarily assumed through an express or an implied-in-fact contract.  The enforceability of covenants not to disclose trade secrets and covenants not to compete that are intended to protect trade secrets, for example, are governed by other law.*

Commissioners' Comment to UTSA § 7 (1979) (emphasis added).  The 1985 amendments to UTSA, which "clarified the intent of the 1979 Official Text," eliminated any ambiguity in the statutory text itself by providing that the Act "does not affect: (1) contractual remedies, *whether or not* based upon misappropriation of a trade secret," UTSA § 7(b)(1) (1985) (emphasis added), and the current Commissioners' Comment retains the substance of the 1979 Comment quoted above—that UTSA

---

[6] Defendants' passing references to *Elm City Cheese Co., Inc. v. Frederico*, 251 Conn. 59, 65–66 (1999), and *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 751 (2d Cir. 1998), are unpersuasive.  *Elm City Cheese Co.* did not involve a contract at all, and in *Nora Beverages* the Second Circuit expressly declined to "determine what portion of [the plaintiff's] claims [CUTSA] preempts," 164 F.3d at 751.

does not displace, supersede, or affect contractual obligations or remedies.  *See* Uniform Laws Annotated: Civil Procedural and Remedial Laws 436 (Master Ed. 1990) (containing Commissioners' Prefatory Note (1979) and 1985 amendments); *id.* at 463 (containing Commissioners' Comment to UTSA § 7 (1979) and 1985 amendments).

The Court's reading of § 35-57(b) as not preempting contract claims is underscored by the purpose of UTSA, which was "to harmonize and clarify the law of trade secrets," whose "principles var[ied] from jurisdiction to jurisdiction" because it was "a common law development."  *See* Ramon A. Klitzke, *The Uniform Trade Secrets Act*, 64 Marq. L. Rev. 277, 277 (1980) (citing Commissioners' Prefatory Note (1979)).[7]  Because privately negotiated contractual obligations are applicable only to the parties to a contract, they do not create the variance in "duties imposed by law" among jurisdictions that UTSA sought to "harmonize and clarify."  *See, e.g.*, *Perricone v. Perricone*, 292 Conn. 187, 203 n.15 (2009) ("'The clearest difference between [tort law and contractual law] is that contractual liability is consensual in nature'" while "'courts impose tort obligations, as a matter of law, for policy reasons.  *The state, rather than private parties, defines the conduct that will be subject to sanction.*'" (quoting Alan E. Garfield, "Promises of Silence: Contract Law and Freedom of Speech," 83 Cornell L. Rev. 261, 348 (1998; emphasis added)).  Simply put, the ability of parties to contract—and thus voluntarily bind themselves to duties and obligations—is not "affect[ed]" by UTSA.

Reading § 35-57(b)(1) in the same manner as the Commissioners intended the identical UTSA § 7(b)(1), it is clear that CUTSA does not preempt Plaintiff's contract claims, regardless of

---

[7] The Court cites to the Klitzke article because the UTSA annotations cite it for further reading.  *See* Uniform Laws Annotated: Civil Procedural and Remedial Laws 463 (Master Ed. 1990) (annotating UTSA § 7 and citing Klitzke article).

whether those claims are premised on Defendants' alleged misappropriation of trade secrets.[8]  In addition, Defendants make no argument or showing that the contractual provisions on which Plaintiff relies are in "conflict[]" with CUTSA's provisions, further suggesting that in this case CUTSA should not be read to have preempted IRA's contract claims.

Finally, although the case-law is extremely sparse on this point, authority from other states—which provides relevant interpretative guidance in this field, *see* Conn. Gen. Stat. § 35-58 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.")—bolsters the Court's conclusion that CUTSA does not preempt even those breach-of-contract claims premised on breaches of confidentiality provisions resulting in a misappropriation of trade secrets.  In *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 108 Wash.2d 38 (1987), the Washington Supreme Court held that its trade secrets act, which contains language substantially identical to § 35-57, did not preempt or displace contract claims based on trade secret misappropriation.  In *Sierracin*, the defendant had "signed over 270 contracts with Boeing" that included language requiring it to "keep confidential . . . all proprietary information," and after Sierracin disclosed the information, Boeing brought suit alleging both breach of contract and a violation of Washington's trade secrets act.  The court expressly "reject[ed] th[e] argument" that the claims should be "consolidat[ed]," holding that the breach-of-contract and trade-secret-misappropriation claims included non-overlapping elements,

---

[8] IRA argues that the "non-compete and non-disclosure obligations for which it paid millions of dollars" contain "provisions [that] are broader than trade secrets in that they restrict Defendants' use of patented, confidential, and other proprietary technology of IRA" and that "IRA would not have paid $2.75 million for trade secret protection that the law affords to IRA for free."  (Pl.'s Opp'n [Doc. # 162] at 31.)  The Court need not resolve whether the contract claims are premised only on misappropriation of trade secrets, because even if they were, the Court has concluded that they would nonetheless not be preempted.

that "breach of confidentiality claims . . . may be brought independently of trade secrets claims," *id.*
at 48, 108 Wash.2d at 673–74 (citing *E.I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100,
102 (1917)), and that similarly, "a contractual provision designed to protect against disclosure would
also not be subject to displacement by the Uniform Trade Secrets Act," *id.* The *Sierracin* court also
observed that in the legislative history to the act—the Proceedings in Committee of the Whole of
the Uniform Trade Secrets Act of the National Conference of Commissioners on Uniform State
Laws—"[t]he Committee specifically dealt with the question and decided as follows: 'Should the Act
cover contract liability as well as tort liability?  The answer then was: No.  It is the judgment of the
Committee that the answer still should be no, and that the Act limit itself to the tort situation.'" *Id.*,
108 Wash.2d at 674; *accord Hutchison v. KFC Corp.*, 809 F. Supp. 68, 71 (D. Nev. 1992) (holding
breach-of-contract claim not preempted by trade secrets act where the "breach of contract theory
is based on the alleged misappropriation of a trade secret" because "[c]ontractual remedies can be
sought in conjunction with remedies provided by the Uniform Trade Secrets Act").  The Court's
research reveals no cases other than *Sierracin* and *Hutchison* squarely addressing this issue, and
reveals no cases holding that CUTSA preempts such contract claims.  Consistent with the
Commissioners' Comment to UTSA § 7 and the only relevant case-law the Court's research has
revealed, the Court holds that CUTSA does not preempt Plaintiff's breach of contract claims
regardless of whether they are predicated on a theory that Defendants violated contractual
confidentiality provisions by misappropriating trade secrets.

Having concluded that the evidence would support a reasonable jury's conclusion that
Defendants used IRA's confidential information and trade secrets, and that CUTSA does not
preempt Plaintiff's breach-of-contract claims, the Court turns to the causes of action on which
Defendants seek summary judgment.

C.      Ramirez's Alleged Breach of the Confidential Disclosure Agreement

As described above, the Confidential Disclosure Agreement required Ramirez and the PhD LLC to "receive[] and h[o]ld in confidence" IRA's "business and/or technical information which [IRA] regards as proprietary" until August 22, 2005, but excluded from its scope information "which is known to [Ramirez or the PhD LLC] prior to receipt from [IRA] under this Agreement," "is information generally available to the public," or "which is discovered or developed by [Ramirez or the PhD LLC] independently of any disclosure from [IRA] prior to such disclosure."  IRA claims that Ramirez breached the Confidential Disclosure Agreement by using IRA's confidential information to develop the technology described in the applications for the ´431 and ´729 Patents.

Among the "well settled rules" of contract law in Connecticut are that "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.  The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract."  *E.g.*, *Office of Labor Relations v. New England Health Care Employees Union, District 1199, AFL–CIO*, 288 Conn. 223, 231 (2008) (internal quotations and alterations omitted; ellipsis in original).  If "the language of a contract is susceptible to more than one reasonable interpretation," then "the contract is ambiguous" and interpretation of its terms is "a question of the parties' intent" and thus "a question of fact."  However, "when there is definitive contract language, the determination of what the parties intended by their commitments is a question of law" to be resolved by the Court.  *E.g.*, *City of Bristol v. Ocean State Job Lot Stores of Conn., Inc.*, 284 Conn. 1, 7 (2007) (alterations omitted).

An interpretation of the Confidential Disclosure Agreement's exclusion of information known prior to disclosure made "*under this Agreement*" to mean that the agreement's coverage extends only to information disclosed pursuant to its terms, rather than to all information, whenever disclosed, that any party views as confidential, is bolstered by the parties' explanation for the agreement's existence, which speaks to post-execution disclosures.  The agreement presumed that "[d]uring the course of discussions" regarding "patented and patent pending technologies" specified in an appendix to the agreement, "it *may be* necessary for one party to disclose to the other business and/or technical information which the disclosing party regards as proprietary."  Consistent with its forward-looking introduction, the agreement frames the "conditions" it imposes on "the receiving party" (among them "that SAID INFORMATION will be received and held in confidence by the recipient") in the future tense: the "SAID INFORMATION *will*" be held in confidence; the recipient "*will* take" steps necessary to prevent disclosure; the recipient "*will not* disclose or commercially utilize" the information without written consent; and the recipient "*will not*" otherwise use the information.  These conditions set forth a disclosure and protection scheme for the information and specifies that it covers only information not known "prior to receipt from the disclosing party *under this Agreement,*" that is, under the agreement's scheme.  Together, the contract's provisions make clear that the Confidential Disclosure Agreement keeps confidential that information which the parties envisioned sharing with one another *after* execution of the agreement and pursuant to its terms.

Under the unambiguous terms of the Confidential Disclosure Agreement, Plaintiff's claim that Defendants breached the Confidential Disclosure Agreement must fail because it is undisputed that after Ramirez's August 2000 separation from IRA and after execution of the Confidential Disclosure Agreement, IRA never involved Ramirez in its research and development efforts relating

to the patented and patent pending technologies specified in the Confidential Disclosure Agreement. Therefore, neither Ramirez nor the PhD LLC "received" any "SAID INFORMATION" "under th[e]" agreement, and instead any of IRA's confidential information that Ramirez or the PhD LLC improperly used would have been known "prior to receipt from [IRA] under th[e Confidential Disclosure] Agreement." Therefore, Defendants are entitled to summary judgment on Plaintiff's claim that they breached the Confidential Disclosure Agreement.

>    D.    Ramirez's Alleged Breach of the Consulting Agreement

The Consulting Agreement provided that because IRA "desires to have the assistance of [the PhD LLC] in the transition of management of its business in the market formerly served by [IRA]," and in consideration for IRA's redemption on August 23, 2000 of "a portion of the issued and outstanding shares of capital stock owned by [Ramirez]" (who "has been a major stockholder, and a director and officer of IRA, which has engaged in the development of certain patented processes and related manufacturing and consulting services"), for which IRA would pay the PhD LLC $18,333.00 monthly until June 30, 2013, the PhD LLC agreed to a broadly-worded nondisclosure provision:

> The [PhD LLC] agrees that it will not at any time disclose to any person, or use, in competition with or in a manner otherwise detrimental to the interests of [IRA], for the benefit of itself or others, any confidential information related to [IRA], including but not limited to know-how, formulas, trade secrets or operational methods for any reason or purpose whatsoever.

At oral argument counsel for Defendants agreed that if the Consulting Agreement applied at all, it applied both to the PhD LLC and to Ramirez personally. (*See* Oral Arg. Tr. at 47–48.)

Defendants argue that the broadly-worded nondisclosure provision quoted above "is prospective, from the date it was executed," because the two sentences preceding it reference, first, another confidentiality and nondisclosure agreement, and second, a statement that "[t]he [PhD

LLC] *will also be provided* access to confidential and proprietary information about *the other operations of* [IRA] as a necessary part of performing services under this Agreement" (emphasis added), and therefore the natural and unambiguous reading of the third sentence, reproduced above, must be that it applies only to the information disclosed under the Consulting Agreement. (Defs.' Mem. Supp. at 18–19.) The Court disagrees because the contract is ambiguous, and therefore its meaning must be determined by a jury. *See, e.g.*, *City of Bristol*, 284 Conn. at 7; *accord Isham v. Isham*, 292 Conn. 170, 181 (2009) ("When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact.").

Unlike the Confidential Disclosure Agreement, in which the information protected by the nondisclosure covenant is unambiguously defined by temporally-limited language, the Consulting Agreement's three-sentence section setting forth the Defendants' nondisclosure obligations contains both temporally-limited language and broader language containing no such restrictions. If the final sentence, which prohibits Defendants from disclosing or using "any confidential information related to [IRA] . . . for any reason or purpose whatsoever," refers only to the "confidential information" described in the second sentence, then Defendants cannot have breached its terms, since it is undisputed that neither Ramirez nor the PhD LLC actually "perform[ed] services under th[e] Agreement," which is the conduct for which its "access to confidential and proprietary information" not yet disclosed would be "a necessary part." However, the final sentence contains a number of words indicating application to all confidential information regardless of the basis or timing of its disclosure to Defendants. It refers to "*any* confidential information," provides a nonexhaustive list of types of information (specifying that the contract clause was "not limited to" those types of information), and indicates a lack of other limitations, including that the nondisclosure obligation applies "at *any* time" and "for *any* reason or purpose whatsoever." In contract law, "[r]ead naturally,

the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31–32 (2004); *accord Earl B. v. Comm'r of Children and Families*, 288 Conn. 163, 175 (2008) (noting that in "common usage," "[t]he term 'any' commonly means '[o]ne, some, every or all without specification'" (quoting  American Heritage Dictionary of the English Language (4th Ed. 2000))).  Read this way, the final sentence of the relevant section of the Consulting Agreement suggests that the contract's scope includes all confidential information, regardless of how or when either Ramirez or the PhD LLC acquired it.  The use of the word "any" in the third sentence also renders the provision ambiguous as to whether Defendants' obligations under it continue indefinitely or terminate at the end of the Consulting Agreement's term: the provision bars Defendants' disclosure or use of the information "at any time," but the Consulting Agreement also specifies that its "term . . . shall terminate on June 30, 2013," unless IRA terminates it earlier for cause (*see* Consulting Agreement at 2, 3 (§§ 2, 5)).  Because the contract is ambiguous in these ways, summary judgment is inappropriate.

Defendants also argue that the Consulting Agreement's nondisclosure and confidentiality provision is a "restrictive covenant" that is not enforceable because it "does not contain any geographic or temporal limitations," and therefore "cannot pass muster under" *Scott v. General Iron & Welding Co.*, 171 Conn. 132, 137 (1976).  (*See* Defs.' Mem. Supp. at 32–33.)  *Scott* explained that "[i]n order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place, and must be reasonable—that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public."  *Scott*, 171 Conn. at 137 (alterations and internal quotations omitted); *accord Robert S. Weiss and Assocs., Inc. v. Wiederlight*, 208 Conn. 525, 529 n.2 (1988).

Defendants' reliance on the restrictive–covenant cases is misplaced, however, because a restrictive covenant is "ancillary to an employment agreement," *see, e.g.*, *Wiederlight*, 208 Conn. at 529 n.2, and "restricts the activities of an employee following the termination of his employment," *Scott*, 171 Conn. at 137, but the Consulting Agreement is not an employment agreement (*see* Consulting Agreement at 2 (§ 4) ("the [PhD LLC] shall be an independent contractor and nothing in this Agreement is intended to institute the [PhD LLC] as an employee of [IRA]")), and it restricts Defendants' activities only during the term of the consultancy (i.e., through June 30, 2013). The Consulting Agreement's confidentiality and nondisclosure provision is not a "restrictive covenant" "ancillary to an employment agreement," and therefore Defendants cannot rely on restrictive–covenant case–law in attacking the that provision as an unenforceable "non-competition agreement[]."

Because there is ambiguity in the scope and effect of the Consulting Agreement, which must be resolved by a trier of fact, and because the Consulting Agreement does not contain an unenforceable non-competition restrictive covenant, Defendants are not entitled to summary judgment on Plaintiff's claim that they breached the Consulting Agreement by disclosing and using IRA's confidential information and trade secrets.

### E.   Ramirez's Alleged Breach of the Employment Agreement

As described above, the Employment Agreement, which the parties executed on January 1, 2001, provides that in exchange for Ramirez's devotion of time to and performance of services for IRA for up to "four hours in any two consecutive calendar months," and for Ramirez's agreement "that [he] will not willfully disclose, in any manner, at any time (during the Employment Term or thereafter), any such confidential information to any unauthorized third party without the written consent of [IRA]," IRA would "pay [Ramirez] a guaranteed base salary at the annual rate of not less

than $1,000 per year." (Employment Agreement at 2.) Defendants assert, and IRA agrees, that "[Ramirez] was not paid the $1,000 per year as called for in the Employment Agreement." The parties also agree that IRA never asked Ramirez to devote time or perform services during the Employment Term. (Defs.' Mem. Supp. at 23–24; Oral Arg. Tr. at 37–38.) Defendants appear to argue that by failing to pay Ramirez, IRA materially breached the Employment Agreement and therefore cannot assert a claim that Defendants have breached it. (*See* Defs.' Mem. Supp. at 23–24 ("As a result [of IRA's nonpayment and never having asked Ramirez to devote time or perform services], the Employment Agreement is not at issue in this dispute.").)

"It is a general rule of contract law that a total breach of the contract by one party relieves the injured party of any further duty to perform further obligations under the contract," and therefore a party "cannot recover upon a contract unless he has fully performed his own obligation under it, has tendered performance or has some legal excuse for not performing." *Shah v. Cover–It, Inc.*, 86 Conn. App. 71, 75–77 (2004) (emphasis and citations omitted); *see also Bernstein v. Nemeyer*, 213 Conn. 665, 672–73 (1990) ("It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged"). To determine whether a breach is "total," that is, material, courts applying Connecticut law look to the factors set forth in the Restatement (Second) of Contracts:

> "In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party

27

failing to perform or to offer to perform comports with standards of good faith and fair dealing."

*Bernstein*, 213 Conn. at 672 & n.8 (quoting Restatement (Second) of Contracts § 241 (1981); paragraph breaks omitted). The Restatement explains that "[t]he standards of materiality '[are] to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances.'" *Strouth v. Pools by Murphy & Sons, Inc.*, 79 Conn. App. 55, 60 (2003) (quoting Restatement (Second) Contracts § 241 cmt. (a)).

On the summary–judgment record it is not possible to determine as a matter of law whether, taken in the context of the August 2000 Arrangement and in light of the relatively small amount of Ramirez's "base salary" under the Employment Agreement ($1,000 per year for three years in the context of a 13-year, $3 million arrangement), Plaintiff's failure to pay Ramirez the guaranteed base salary constituted a "material breach" of the Employment Agreement. A reasonable jury could conclude, "in the light of the facts of [this] case," *Strouth*, 79 Conn. App. at 60, that IRA's breach was not material or total because Ramirez "can be adequately compensated" by IRA's payment to him of $3,000, because IRA's behavior "comport[ed] with standards of good faith and fair dealing," *see Bernstein*, 213 Conn. at 672 n.8, and given Ramirez's own description of the sum as a "small part" of the August 2000 Arrangement about which he was "[p]robably" "unaware" (Ramirez Dep. at 353–54). Moreover, in light of Ramirez's averment that he operated the PhD LLC starting in 2001 (2d Ramirez Aff. at ¶ 23) and the Employment Agreement's specification that the base salary be "payable in substantially equal biannual installments" but its silence regarding when during the year those payments would be made (*see* Employment Agreement at 2), it is not clear on this record whether Ramirez's disclosure to any third party (including the PhD LLC) of IRA's confidential information and trade secrets occurred before or after IRA's first base salary payment to Ramirez

was due.  Therefore, disputed factual issues remain not only as to the materiality of IRA's breach, but also whether IRA's breach predated or postdated Ramirez's alleged breach.  For these reasons, summary judgment must be denied as to IRA's claim that Ramirez breached the Employment Agreement.

    F.      Ramirez's Alleged Breach of Fiduciary Duty and
             Defendants' Alleged CUTPA Violation

Plaintiff alleges that "[b]y virtue of his position as an employee of IRA and former officer and director of IRA, [Ramirez] owed to IRA fiduciary duties, including, without limitation, a duty of loyalty," and that Ramirez "breached the fiduciary duties he owed to IRA in that . . . [he] misappropriated IRA's confidential information and trade secrets and competed against IRA." (Am. Compl. at Count 4 at ¶¶ 29, 30.)  Plaintiff further alleges that Ramirez "planned and conspired to use and capitalize on IRA's [p]atented [t]echnology and proprietary and confidential and trade secret technology, information and know-how" in a manner that violates the Connecticut Unfair Trade Practices Act ("CUTPA"),  Conn. Gen. Stat. § 42-110a *et seq.*  (*Id.* at Count 5 at ¶¶ 32, 33.) Defendants have moved for summary judgment on these claims, but they have articulated no arguments addressed to them.  They do not argue that Ramirez owed no fiduciary duty to IRA, and they do not argue that their conduct does not violate CUTPA.[9]  Instead, Defendants appear to rely on their argument that the record shows there to be no genuine issue of material fact as to whether Ramirez disclosed, misappropriated, or used IRA's confidential information and trade secrets.  As set forth above, this argument is unavailing because such genuine issues of material fact do exist.

---

[9] Indeed, Defendants assert that the winding-down activities of MV and Ramirez indicate that "[t]he conduct at issue here falls under CUTPA."  (Defs.' Mem. Supp. at 37.)

Therefore, Defendants are not entitled to summary judgment on IRA's claim that Ramirez breached his fiduciary duty and that Defendants violated CUTPA.

III.     Discussion of Defendants' Counterclaims

  A.     IRA's Alleged Breach of the Stock Redemption Agreement,
         Escrow Agreement, and Promissory Note

In the Stock Redemption Agreement IRA and Ramirez agreed that IRA would pay Ramirez $5,000 on August 23, 2000 "in complete redemption of FIFTY (50) of his shares of the common capital stock of [IRA]," and that "[o]n the date and under the terms specified in that certain ESCROW AGREEMENT," IRA would "commence payment to the order of [Ramirez]" of $175,979.30 "in complete redemption of all of [Ramirez's] remaining interest in [IRA], consisting of TWO THOUSAND FOUR HUNDRED FIFTY (2,450) shares of the common capital stock of [IRA]." The Escrow Agreement provides that Lemieux would serve as the Escrow Agent with whom Ramirez would deposit his 2,450 shares of IRA and who would vote those shares in accordance with MV's instructions, but provides no "date" or "terms" regarding the commencement of IRA's payments to Ramirez in redemption of those 2,450 shares.  (*See* Escrow Agreement, Ex. A to Defs.' Ex. 5.)[10]  Finally, the Promissory Note, which MV executed as IRA's President, provides that IRA,

---

[10] The one copy of the Escrow Agreement in the record, which is attached to the First Agreement, is not executed.  However, the contemporaneous First Agreement is executed, and it "include[s] [the Escrow Agreement] herewith for all purposes by reference thereto," thereby incorporating the Escrow Agreement by reference.  Therefore, notwithstanding that the Escrow Agreement is unexecuted, the First Agreement and Escrow Agreement "may be interpreted together as the agreement of the parties."  *See OCI Mortgage Corp. v. Marchese*, 255 Conn. 448, 475 (2001) (describing, in parenthetical, holding in *E & F Constr. Co. v. Rissil Constr. Assocs., Inc.*, 181 Conn. 317, 319 (1980) ("Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties." (citations omitted))).

as Maker, would pay "[m]onthly installments of principal and interest in the amount of TWO THOUSAND ONE HUNDRED FIFTY ($2,150) DOLLARS" to Ramirez, as Holder, on the first day of each month "commencing January 1, 2004 and continuing . . . until June 1, 2013." These 114 monthly payments, which total $245,100, result in the payment of a principal balance of $175,979.30 (the same value as set forth in the First Agreement and the Stock Redemption Agreement) paid over the nine and a half years at 7.5 percent interest per annum. The Promissory Note further provides that "[i]n the event of default, said Note shall be due and payable together with all taxes . . . and all costs of collection, including a reasonable attorney's fee incurred in the collection thereof," and that upon default "in any payment due under the terms of this Note or if any default is made under any other term of this Note, the entire principal balance shall, at the option of [Ramirez], immediately become due and payable." (Promissory Note, Defs.' Ex. 10, at 1, 2.)

Ramirez avers that IRA defaulted in its payments due on February 1, 2007 and March 1, 2007, and that "through its counsel, [IRA] attempted to cure the default by resuming payments to [him] under the Promissory Note," but Ramirez "informed IRA that the issuance of the checks did not cure the default," even as he "temporarily defer[red] acceleration of the Note while [the parties] explored a resolution" while he "reserv[ed] [his] right to accelerate the Note." (1st Ramirez Aff. at ¶¶ 16–20.) Because they cross-reference one another and clearly together constitute a single transaction with one clear overarching purpose—for IRA to redeem Ramirez's 2,500 shares in the company for $250,100—the Court reads the Stock Redemption Agreement, Escrow Agreement, and Promissory Note together as constituting a single agreement between IRA and Ramirez. *See, e.g.*, *OCI Mortgage Corp. v. Marchese*, 255 Conn. 448, 475 (2001).

Neither Defendants nor Plaintiff advance any arguments regarding whether IRA breached the Stock Redemption Agreement, Escrow Agreement, or Promissory Note, or whether Defendants

are entitled to summary judgment on their claim that it did so.  In any event, summary judgment is inappropriate on this claim.  "A promissory note is nothing more than a written contract for the payment of money, and, as such, contract law applies." *Emigrant Mortgage Co., Inc. v. D'Agostino*, 94 Conn. App. 793, 799 (2006) (internal quotation and citation omitted); *accord Antonino v. Johnson*, 113 Conn. App. 72, 75 (2009) ("A promissory note is a written contract for the payment of money, and, as such, contract law applies.").  The parties agree that IRA did not make the payments due under the Promissory Note on February 1, 2007 and March 1, 2007, and Ramirez avers that he reserved his right to accelerate the Note, but the record is silent on whether he exercised the option to make "the entire principal balance" of the Promissory Note "immediately . . . due and payable."  In addition, Lemieux testified that he "never received" from Ramirez the 2,450 shares of IRA that the Stock Redemption Agreement and Escrow Agreement called for Ramirez to provide to Lemieux.  (Lemieux Dep., Defs.' Ex. 27, at 55.)  If this testimony is credited, and in light of the obvious overarching purpose of these three agreements, a reasonable jury could conclude that by failing to deposit his shares with Lemieux, Ramirez breached the agreement before IRA did, that this breach was material, and thus that it excused IRA's nonperformance in February and March of 2007.  *See Bernstein*, 213 Conn. at 672–73 & n.8; *Shah*, 86 Conn. App. at 76–77; *Strouth*, 79 Conn. App. at 60.  Therefore, summary judgment must be denied on Defendants' claim that IRA breached these three contracts.

B.   IRA's Alleged Breach of the Consulting Agreement

Defendants also claim that IRA breached the Consulting Agreement by ceasing the monthly payments due under it despite Ramirez's having not breached the agreement.  It is undisputed that IRA stopped making payments to Ramirez under the Consulting Agreement, but for the reasons set forth above, the Court cannot conclude that this nonpayment constitutes an actionable breach

because genuine issues of material fact remain as to whether and when Ramirez materially breached the same contract.  Therefore, Defendants are not entitled to summary judgment on this claim.

C.      IRA's Alleged Unjust Enrichment

Defendants further claim that IRA has been unjustly enriched by its failure to make payments to Defendants in exchange for his ownership interest in IRA, and that Defendants are entitled to recovery of the amount of IRA's unjust enrichment.  Because summary judgment is inappropriate on the parties' breach-of-contract claims relating to IRA's redemption of Ramirez's ownership interest, Defendants are also not entitled to summary judgment on their unjust enrichment claim, because it is not clear whether either party will recover on their contract claims, and "[t]he lack of a remedy under a contract is a precondition to recovery based on unjust enrichment or quantum meruit."  *United Coastal Indus., Inc. v. Clearheart Constr. Co., Inc.*, 71 Conn. App. 506, 513 (2002).

D.      IRA's Alleged Violation of CUTPA

Finally, Defendants claim that IRA violated CUTPA.  After setting forth the basic legal principles governing CUTPA claims, Defendants argue that "[t]he conduct at issue here falls under CUTPA because [MV] and [Ramirez] were winding down their business together and [Ramirez] was selling his share of the business to IRA."  (Defs.' Mem. Supp. at 37.)

Defendants are not entitled to summary judgment on this CUTPA claim.  "IRA is a chemical research and development company focused on skin care products, cosmetics and prescription dermatology products," its "primary work has been in the area of developing [BPO]-based formulations used in products to treat acne," and it is "well known within industry circles as a highly innovative formulator of BPO compositions."  (NV Aff. at ¶¶ 3, 4.)  IRA's primary business is not the buying or making of securities or redemption of its own stock, and as it points out, "a CUTPA

violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 523 (2006) (following *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107, 111–13 (D. Conn. 1998), and *Arawana Mills Co. v. United Techs. Corp.*, 795 F. Supp. 1238, 1252–53 (D. Conn. 1992)); *see also Sovereign Bank v. Licata*, 116 Conn. App. 483, 494 (2009) (quoting *McCann*).  Defendants do not argue otherwise in reply.

Where a counterclaim–plaintiff's "allegations solely relate[] to an ancillary transaction that was incidental to the [counterclaim–defendant's] primary . . . business," they "f[a]ll outside the CUTPA penumbra," and the counterclaim–defendant cannot "be made subject to CUTPA sanctions for its conduct as alleged by the [counterclaim–plaintiff]." *Licata*, 116 Conn. App. at 494–95 (vacating trial court's award made pursuant to CUTPA, and holding that company "engaged in the business of real estate acquisition" could not be held liable under CUTPA for claim based on its "acquisition of [a] mortgage loan and note," its "forbearance agreement," and the "conduct between the parties during the period of forbearance" because the company was not "engaged in the mortgage business").  Because the transactions between IRA and Defendants involved in this case do not relate to the business in which IRA was engaged—chemical research and development, and formulation of BPO solutions to treat acne—IRA cannot be held liable to Defendants under CUTPA for its conduct related to those transactions.  Therefore, Defendants are not entitled to summary judgment on their CUTPA claim against IRA.

IV.     Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. # 149] is GRANTED IN PART and DENIED IN PART as follows: the motion is granted as to Plaintiff's claim that Ramirez breached the Confidential Disclosure Agreement (Plaintiff's Count One), and it is otherwise denied. Plaintiff's other claims, and all of Defendants' counterclaims, remain for trial. In addition, as set forth on the record on February 5, 2010, the parties' Motions to Seal [Doc. ## 150, 155] are GRANTED until further order of the Court.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of June, 2010.